[No. D038835. Fourth Dist., Div. One. Oct. 21, 2002.]

REDEVELOPMENT AGENCY OF THE CITY OF SAN DIEGO, Plaintiff and Respondent, v.
SALVATION ARMY, Defendant and Appellant.

COUNSEL

Woolls & Peer and H. Douglas Galt for Defendant and Appellant.

Foley & Lardner, Richard G. Opper and Linda C. Beresford for Plaintiff and Respondent.

OPINION

KREMER, P. J.—Defendant Salvation Army (Army) appeals the portion of a judgment after court trial favoring plaintiff Redevelopment Agency of the City of San Diego (Agency) on Agency's cause of action for cost recovery under the Polanco Redevelopment Act (Health & Saf. Code, § 33459 et seq., Polanco Act). Army contends the court erred in concluding Agency satisfied the legal requirements for recovery of such costs. Army also contends the court should have awarded Army its litigation costs and attorney fees. We affirm the judgment.

I

INTRODUCTION

Army owned a parcel (the Property) located in an area where Agency was acquiring properties for a redevelopment project. In accord with the Polanco

Act, Agency gave Army notices to submit a timely proposed action plan for remediating hazardous substances on the Property. However, when Army failed to submit any plan by the statutory deadline, Agency proceeded to take actions it deemed necessary to remove hazardous substances from the Property.

Agency developed a master work plan for the redevelopment project that received the approval of the County of San Diego Department of Environmental Health (County Department), the regulatory agency overseeing the redevelopment project. After filing this lawsuit against Army for eminent domain, cost recovery under the Polanco Act and declaratory relief, Agency took possession of the Property. Later, the County Department approved a property mitigation plan submitted by Agency for remediation of the Property. After discovering lead contamination in burn ash[1] found at the Property, Agency received the County Department's approval for an amendment to the property mitigation plan to establish a cleanup level for the lead. Agency proceeded to complete the remediation work contemplated in the amended property mitigation plan.

Meanwhile, after the parties to this lawsuit settled all claims on Agency's cause of action for eminent domain, the court entered a final order of condemnation vesting title to the Property in Agency. When the lawsuit ultimately came on for trial, Agency's only remaining cause of action was for recovery of costs under the Polanco Act. At trial, Agency claimed entitlement to costs it incurred in performing remediation of hazardous substances at the Property, including the excavation and removal of contaminated soil. In defending against Agency's Polanco Act claim, Army argued Agency was not entitled to recover those costs since Agency assertedly failed to comply with procedural requirements of federal law[2] purportedly incorporated into the Polanco Act. After trial, the court awarded Agency its costs requested under the Polanco Act.

On appeal, Army contends Agency's excavation and waste disposal costs were not recoverable under the Polanco Act since those costs were assertedly not within the scope of CERCLA but instead were incurred only to comply with state waste disposal regulations. Army also contends Agency did not demonstrate that Army was a "responsible party" subject to liability under

---

[1]Burn ash, the residue of combustion of organic materials, often contains lead and other hazardous material.

[2]The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. § 9601 et seq.—CERCLA) and the national contingency plan, regulations issued by the United States Environmental Protection Agency to implement CERCLA by establishing a process for cleanups performed under that statute. (*Id.*, § 9605; 40 C.F.R. § 300 et seq. (2002).)

the Polanco Act. Army further contends Agency did not satisfy a condition precedent for recovery under the Polanco Act, to wit, a request that Army submit a proposed remedial action plan for the Property. Finally, Army contends it was entitled to an award of its litigation costs and attorney fees. However, since Army has not shown any prejudicial judicial error, the judgment must be upheld.

## II

### FACTUAL AND PROCEDURAL BACKGROUND

Army owned the Property, a parcel in the East Village Redevelopment District of downtown San Diego. In the process of acquiring properties necessary for its redevelopment project, Agency took steps to ensure that acquired properties would be remediated of hazardous substances.

In March 1998 Agency retained an environmental consultant, Environmental Business Solutions, Inc. (EBS), to work with the County Department to prepare a phase I environmental site assessment of 35 blocks in the redevelopment area by researching the current and historical uses of properties to assess the likelihood that a release of hazardous substances requiring remediation had occurred there. Upon identifying a possible underground storage tank under the sidewalk adjacent to the Property as a potential pollution problem, EBS prepared an "Initial Scope of Work" to address the tank and any other possible contamination at the Property. The Initial Scope of Work included a comprehensive site reconnaissance and a phase II site assessment of the Property involving investigation of hazardous materials and wastes.

In September 1998 Agency sent Army a notice requesting that Army submit a proposed remediation action plan for the Property within the 60-day time limit established by the Polanco Act. (Health & Saf. Code, § 33459.1, subd. (b)(2).) The notice also stated Army would be held liable for the costs to remediate the Property if Army failed to submit a plan. Included with the notice was the Initial Scope of Work that identified some of the potential hazardous substances at the Property and requested that Army perform additional work. In October 1998 Agency sent Army a notice extending by an additional 30 days the time for Army to submit a proposed remediation action plan. However, Army did not respond to Agency's notices.

Meanwhile, in October 1998, upon Agency's request, the California Environmental Protection Agency designated the County Department as the

lead regulatory agency to provide oversight for the redevelopment project. (Health & Saf. Code, § 33459.1, subds. (a)(1), (d).)[3]

In 1999 Agency worked with the County Department to develop a master work plan describing the assessment and remedial plan for the redevelopment project area. During the process, the master work plan was available for public comment and Agency conducted a public hearing to discuss that plan. However, Army did not submit comments or attend the hearing.

In August 1999 the County Department notified Army of an unauthorized release of hazardous substances from an underground storage tank at the Property. In September 1999 the County Department asked Army to submit a work plan describing its activities to investigate that unauthorized release.

Also in September 1999, the County Department approved Agency's master work plan. The master work plan certified that actions consistent with its procedures and methodologies were deemed consistent with the national contingency plan. Further, in approving the master work plan, the County Department found conformance with that plan constituted compliance with the national contingency plan.

In February 2000 Agency filed this lawsuit against Army. Upon Agency's deposit of $100 for acquisition of the Property, the court issued an order for possession of the Property, with possession to be effective on May 8, 2000.

In March 2000 Army submitted to the County Department a work plan to remove the underground storage tank and assess the surrounding area.

On May 8, 2000, Agency took possession of the Property. After Agency demolished the structures on the Property, soil was exposed and showed signs of staining from burn ash.

In October 2000, through its environmental consultant EBS, Agency submitted a property mitigation plan to the County Department and Army. Agency's property mitigation plan discussed proposed approaches for assessing and remediating the Property. Further, the property mitigation plan included health risk information beyond that provided in the master work plan. However, Army did not submit any comments on the property mitigation plan.

---

[3]Health and Safety Code section 33459.1, subdivision (d) provides that under specified conditions, a redevelopment agency "may designate a local agency . . . to review and approve a cleanup or remedial action plan and to oversee the remediation or removal of hazardous substances from a specific hazardous substance release site . . . ."

In October 2000 after Army had retained contractors who removed the underground storage tank and some soil impacted by the release from the tank, the County Department notified Army that no further action related to the petroleum released from the tank was required.

In November 2000 the County Department approved Agency's property mitigation plan. In doing so, the County Department noted that the scope of work in the property mitigation plan provided for excavation and assessment of soil impacted by lead and hydrocarbons within the construction envelope proposed for the Property's future site uses.[4] The County Department also noted contaminated soil would be transported off-site for treatment and/or disposal.

Later in November 2000 in accord with the parties' stipulation, the court entered an order indicating that Army did not dispute or contest Agency's right to take and condemn the Property in this action; and that Army reserved all other claims and defenses asserted in the action.

In December 2000 after lead contamination was discovered in the burn ash on the Property, Agency's environmental consultant EBS submitted to the County Department and Army an amendment to Agency's property mitigation plan to establish a proposed cleanup level for lead. Aware of the lead-impacted soil, the County Department approved the amendment. Agency did remediation work on the Property consistent with the amended property mitigation plan, including excavation and disposal of contaminated soil. Agency's work did not consist of construction excavation but instead simply involved the removal of thin layers of burn ash spread across a portion of the Property. Army did not object to Agency's actions until Agency had completed the majority of the work contemplated by the amended property mitigation plan.

In February 2001 in settling all claims relating to Agency's cause of action for eminent domain, the parties stipulated: The total amount of just compensation for the taking of the Property was $550,000; that amount included compensation for all claims Army made or could have made concerning the eminent domain cause of action; the amount included compensation for the Property and its improvements, any damages to the Property, litigation costs, attorney fees, precondemnation damages, severance damages, loss of goodwill, and prejudgment interest. The parties also stipulated: Agency would pay into the court's account for deposit into the county treasury the amount of $289,900; that sum represented the agreed-upon

---

[4]The construction envelope was the area of the Property that would be excavated for the foundation of a planned structure.

$550,000 amount of just compensation minus Agency's $100 deposit and an estimated $260,000 for environmental investigations and remediation of the Property; upon Agency's payment of $289,900 into the court's account, Agency would submit an application for entry of a final order of condemnation and the Property would be condemned for the uses and purposes stated in Agency's complaint; the use for which the Property was sought to be condemned was authorized by law for public use; the taking in condemnation was necessary for such public use; and the agreed-upon $550,000, less any amount later determined to be recoverable under the Polanco Act, was in full payment for the interests in the land taken, together with all improvements on the land, and for all damage Army suffered due to the taking. The superior court entered an order in accord with the parties' stipulations.

Later in February 2001, Agency deposited $289,900 with the court to pay for interests to be acquired in the Property. (Code Civ. Proc., § 1255.030, subd. (f).)

In March 2001 upon Agency's application, the court entered a final order condemning the Property to Agency for public purposes in fee simple absolute. (Code Civ. Proc., § 1268.030.)

In June 2001 when this lawsuit came on for trial, Agency's only remaining cause of action was for recovery of costs under the Polanco Act. After trial, the superior court concluded Agency was entitled to recover costs under the Polanco Act because as a responsible party for purposes of that statute, Army had not responded to Agency's request for submission of a proposed remedial action plan before the statutory deadline. Further, although "not persuaded" that compliance with the national contingency plan was a prerequisite to recovery under the Polanco Act, the court also concluded that even if such compliance were a prerequisite, undisputed evidence indicated the work done by Agency was consistent with that plan. The order entered on the court's decision stated Agency was entitled to a total award of $171,893.24, based upon Agency's remediation payments to date, interest, attorney fees and a sum for the County Department's oversight. The court also invited the parties to comment on future costs.

In July 2001 the parties stipulated: Agency was authorized to deduct $236,800.24 from money currently withheld on Army's behalf; that amount consisted of the sum necessary to satisfy the court's $171,893.24 award plus additional attorney fees and an estimated $40,000 in mediation costs not yet paid by Agency.

In August 2001 the court entered final judgment including the language of its June 2001 order and providing for payment to Agency in accord with the parties' July 2001 stipulation. Army appeals the August 2001 judgment.

## III

### DISCUSSION

### A

*CERCLA's Impact on Agency's Recovery of Costs Under the Polanco Act*

 Citing a portion of the Polanco Act involving liability for the costs of remediating or removing a release of hazardous substances within a redevelopment project area (Health & Saf. Code, § 33459.4, subd. (c)),[5] Army contends Agency's excavation and waste disposal costs were not recoverable under the Polanco Act since those costs were assertedly not within the scope of CERCLA. Specifically, Army contends that by importing CERCLA's "scope and standard of liability for cost recovery," the Polanco Act (Health & Saf. Code, § 33459.4, subd. (c)) limited Agency's recovery of costs to those removal or remedial costs recoverable under 42 United States Code section 9607(a).[6] Thus, according to Army, to recover costs under the Polanco Act, Agency was required to prove that (1) Army came within one of CERCLA's categories of persons liable for removal or remedial costs (42 U.S.C. § 9607(a)); (2) the site of the cleanup was a facility as defined in CERCLA (*id.,* § 9601(9)); (3) there was a release or threatened release of hazardous substances at the facility; (4) Agency incurred response costs resulting from such release or threatened release; and (5) the removal or remedial costs incurred by Agency were "not inconsistent with the national contingency plan" (*id.,* § 9607(a)(4)(A)). Army asserts Agency failed to establish at least two of those elements, to wit, that Agency's excavation and disposal actions were not inconsistent with the national contingency plan and that Army was a responsible party with respect to the soil contaminated by burn ash. However, as we shall explain, the superior court properly concluded Agency established entitlement to recovery under the Polanco Act.

---

[5]Health and Safety Code section 33459.4, subdivision (c) provides: "An agency may recover any costs incurred to develop and to implement a cleanup or remedial action plan approved pursuant to Sections 33459.1 and 33459.3, to the same extent the [Department of Toxic Substances Control] is authorized to recover those costs. The scope and standard of liability for cost recovery pursuant to this section shall be the scope and standard of liability under [CERCLA] as that act would apply to the [Department of Toxic Substances Control]; provided, however, that any reference to hazardous substance therein shall be deemed to refer to hazardous substance as defined in subdivision (c) of Section 33459."

[6]Section 9607 of 42 United States Code is a portion of CERCLA involving liability. Subdivision (a)(4)(A) of that section provides in relevant part that specified parties shall be liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan."

1

*Cost Award Was Not Inconsistent with National Contingency Plan*

Army contends the superior court erred in awarding Agency costs incurred in its excavation and removal actions since Agency assertedly failed to show that those actions were not inconsistent with the national contingency plan. Army characterizes the reference in the Polanco Act (Health & Saf. Code, § 33459.4, subd. (c)) to the portion of CERCLA (42 U.S.C. § 9607(a)(4)(A)) making mention of the national contingency plan as limiting recovery of remedial and removal costs under the Polanco Act to those incurred in preventing "an actual and real threat to human health or the environment." (*Carson Harbor Village, Ltd. v. Unocal Corp.* (9th Cir. 2001) 270 F.3d 863, 871; *Yellow Freight System, Inc. v. ACF Industries, Inc.* (E.D. Mo. 1995) 909 F.Supp. 1290, 1299.) Asserting the contamination levels of the soil excavated and removed by Agency presented no such threat, Army contends Agency's excavation and removal actions did not constitute a necessary response to an actual threat to human health or the environment. Thus, Army concludes that since Agency's actions were assertedly not "compelled" by the national contingency plan, those actions were inconsistent with that plan and could not support recovery under the Polanco Act.

However, as we shall explain, the elements of a cause of action for cost recovery under the Polanco Act differ from those for a cost recovery action under CERCLA. Hence, since the national contingency plan is not an element of cost recovery under the Polanco Act, that plan did not apply to Agency's actions. Nevertheless, as the superior court properly stated, to the extent compliance with the national contingency plan was a prerequisite to recovery of costs under the Polanco Act, Agency's actions were not inconsistent with that plan.

█ CERCLA was enacted " 'to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites.' " (*United States v. Northeastern Pharmaceutical* (8th Cir. 1986) 810 F.2d 726, 733.) CERCLA is "a comprehensive environmental statute principally designed to effectuate two goals: (1) the cleanup of toxic waste sites; and (2) the compensation of those who have attended to the remediation of environmental hazards." (*Franklin Cty. Conv. Facilities v. American Premier* (6th Cir. 2001) 240 F.3d 534, 541.) The elements of a claim by a government agency to recover costs associated with a cleanup conducted under CERCLA are: (1) the site is a "facility"; (2) a "release" or "threatened release" of a hazardous substance occurred; (3) the government agency incurred costs not

inconsistent with the national contingency plan; and (4) the defendant is a responsible party. (42 U.S.C. § 9607(a); *U.S. v. Chapman* (9th Cir. 1998) 146 F.3d 1166, 1169.)

The Polanco Act involves cleanup of the release of hazardous substances in the context of a redevelopment project. The Polanco Act was enacted to provide a redevelopment agency with the means to require responsible parties to bear the costs of mitigating contamination on property within that agency's redevelopment project area. "By explicitly granting an agency authority over properties owned by responsible parties and participating owners, as well as expanding its authority to act when those parties fail to cooperate," the Polanco Act gives redevelopment agencies "more clout to clean up blighted properties." (Sen. Rules Com., Analysis of Sen. Bill No. 1898 (1995-1996 Reg. Sess.) Aug. 19, 1996.) The elements of a claim for recovery of costs under the Polanco Act are: (1) the property is located within a redevelopment project area (Health & Saf. Code, § 33459.1, subd. (a)(1)); (2) the presence of a release of a hazardous substance within the project area (*ibid.*); (3) reimbursement is sought from a defendant who is a "[r]esponsible party" (*id.*, § 33459, subd. (h)); (4) the redevelopment agency has provided the responsible party with a 60-day notice requesting a remedial action plan for the property (*id.*, § 33459.1, subd. (b)(2)); (5) the responsible party failed to submit a remedial action plan or failed to submit a plan the redevelopment agency could approve (*ibid.*); (6) the redevelopment agency reached agreement on a remedial action plan with a regulatory agency overseeing the redevelopment project (*id.*, § 33459.1, subd. (a)(1)); and (7) the redevelopment agency incurred costs to remedy or remove the hazardous substance as necessary to implement the approved plan (*id.*, § 33459.4, subds. (a) & (c)).

However, contrary to Army's suggestion, the Polanco Act does not limit a redevelopment agency's rights to those available under CERCLA. Instead, subject to specified statutory conditions, the Polanco Act (Health & Saf. Code, § 33459.1, subd. (a)(1)) authorizes a redevelopment agency to "take any actions that the agency determines are necessary and that are consistent with other state and federal laws to remedy or remove a release of hazardous substances on, under, or from property within a project area, whether the agency owns that property or not, subject to the conditions specified in subdivision (b)." Further, the Polanco Act (*id.*, § 33459.4, subd. (e)) provides that an action to recover costs "is in addition to, and is not to be construed as restricting, any other cause of action available to a redevelopment agency."

As noted, the Polanco Act (Health & Saf. Code, § 33459.4, subd. (c)) also provides that "the scope and standard of liability" for cost recovery under

that section "shall be the scope and standard of liability" under CERCLA. We construe that reference in the Polanco Act to CERCLA's scope of liability as simply incorporating CERCLA's definitions of who is liable for remedial costs. (42 U.S.C. § 9607(a)(1)-(4); *United States v. Northeastern Pharmaceutical, supra,* 810 F.2d at p. 742.) Similarly, we construe the Polanco Act's reference to CERCLA's standard of liability as merely incorporating the liability standards applied by courts in CERCLA cases, to wit, strict liability regardless of knowledge or intent (*U.S. v. Mexico Feed and Seed Co., Inc.* (8th Cir. 1992) 980 F.2d 478, 484), joint and several liability (*U.S. v. Monsanto Co.* (4th Cir. 1988) 858 F.2d 160, 173), and retroactive liability (*id.* at pp. 173-174). In doing so, we reject Army's contention that the Polanco Act adopted various procedural requirements of the national contingency plan as an element of a cause of action for recovery of costs under the Polanco Act.

Specifically, Army contends Agency could not properly recover costs under the Polanco Act without having complied with the national contingency plan's requirements of (1) a "remedial investigation 'to determine the *nature* and *extent* of the threat presented by the release' " (*Wash. State Dept. of Transp. v. Natural Gas Co.* (9th Cir. 1995) 59 F.3d 793, 803; 40 C.F.R. § 300.430(d)(4) (2002)) and (2) preparation of a feasibility study (40 C.F.R. § 300.430(e)(2)(i) & (e)(7) (2002)). However, we find nothing in the Polanco Act adopting those procedural portions of the national contingency plan or any other portion of that plan as a element of a Polanco Act claim for cost recovery. The Polanco Act's only specific reference to the national contingency plan is contained in Health and Safety Code section 33459.1, subdivision (b)(2).[7] That section provides a redevelopment agency with a basis for evaluating a proposed remedial action plan submitted by a responsible party in response to the agency's 60-day notice, to wit, whether such plan is "consistent, to the maximum extent possible" with various aspects of the national contingency plan. (Health & Saf. Code, § 33459.1, subd. (b)(2).)

---

[7]As noted, the Polanco Act (Health & Saf. Code, § 33459.1, subd. (a)(1)) provides in relevant part: "An agency may take any actions that the agency determines are necessary and that are consistent with other state and federal laws to remedy or remove a release of hazardous substances on, under, or from property within a project area, whether the agency owns that property or not, subject to the conditions specified in subdivision (b)."

Subdivision (b) of Health and Safety Code section 33459.1 provides in relevant part that "an agency may take the actions specified in subdivision (a) only under one of the following conditions: [¶] . . . [¶] (2) A party determined by the agency to be a responsible party for the release has been notified by the agency . . . and has been given 60 days to respond and to propose a remedial action plan and schedule, and the responsible party has not agreed within an additional 60 days to implement a plan and schedule to remedy or remove the release that is acceptable to agency and that has been found by the agency to be consistent, to the maximum extent possible, with the priorities, guidelines, criteria, and regulations contained in the National Contingency Plan."

However, that section does not make compliance with any portion of the national contingency plan a precondition for the agency's recovery of costs under Health and Safety Code section 33459.4. Instead, a redevelopment agency's entitlement to cost recovery under the Polanco Act depends upon the redevelopment agency's implementation of a plan approved by the designated regulatory agency overseeing the redevelopment plan. (*Id.*, §§ 33459.1, subd. (d), 33459.4, subd. (c).) As discussed, Agency's master work plan and its amended property mitigation plan were approved by the County Department. In sum, we decline to interpret the mention of the national contingency plan in one portion of the Polanco Act (*id.*, § 33459.1, subd. (b)(2)) or in one portion of CERCLA involving liability (42 U.S.C. § 9607(a)(4)(A)) as effecting incorporation of compliance with the national contingency plan into the Polanco Act as an element of a cause of action to recover costs. Thus, in seeking recovery of costs under the Polanco Act, Agency was not required to demonstrate compliance with the national contingency plan.[8]

In any event, even if we deemed the national contingency plan to apply to Agency's work at the Property, the record indicates Agency's actions were not inconsistent with that plan. Originally developed to deal with emergency response actions to oil spills, the national contingency plan has been amended to support response actions conducted by the United States Environmental Protection Agency under the Clean Water Act (33 U.S.C.A. §§ 1251-1387) and to guide governmental agencies responding to hazardous waste sites under CERCLA. (Starfield, *The 1990 National Contingency Plan—More Detail and More Structure, But Still a Balancing Act* (1990) 20 Envtl. L. Rep. 10222.) The United States Environmental Protection Agency has stated that the goals of the national contingency plan are most useful if "maintained as general principles to assist in flexible, site-specific decision-making." (55 Fed.Reg. 8666, 8703 (Mar. 8, 1990); Starfield, *supra*, 20 Envtl. L. Rep. 10222.) Further, the United States Environmental Protection Agency has also acknowledged that the "program management principles" in the national contingency plan "are neither binding nor appropriate in every case; they must be applied as appropriate." (55 Fed.Reg. 8666, 8705, 8722 (Mar. 8, 1990); see 42 U.S.C. § 9621; 40 C.F.R. § 300.430(a)(2), (b), (d)(1) & (2), (e)(7) & (9)(iii) (2002); cf. Health & Saf. Code, §§ 25350, 25356.1, subd. (h)(3).)

Army contends Agency's master work plan set forth the correct procedure for remediation consistent with the national contingency plan by identifying

---

[8]Moreover, the portion of Health and Safety Code section 33459.1, subdivision (b)(2) involving a determination whether a plan submitted by a responsible party was consistent with the national contingency plan did not come into play here because, as we shall explain, Army did not submit any such plan to Agency within the time limits established by the Polanco Act.

contaminants of concern, determining their concentration levels, comparing those levels to preliminary remediation goals based on cancer risks of one in a million and considering pathways of exposure to humans. Although conceding "the Master Work Plan shows precisely what constitutes" a remediation procedure consistent with the national contingency plan, Army contends Agency did not follow that procedure with respect to the contaminated soil within the construction envelope at the Property. Army faults Agency for instead implementing the proposal of the amended property mitigation plan, a plan that assertedly "contained no risk assessment; in particular, it contained no finding that contaminants above background levels but below Preliminary Remediation Goals presented a cancer risk of 1 in 1,000,000." Army contends the amended property mitigation plan "proposed the disposal of contaminated soil because it constituted 'waste'" under state waste handling regulations "rather than because it presented a genuine human health threat." Army thus concludes that Agency acted inconsistently with the national contingency plan when—after taking possession of the Property, demolishing the existing structures and finding contaminants in the newly exposed soil—Agency removed the contaminated soil from the Property solely to comply with state regulations, not because of any threat to human health or the environment.

In essence, Army contends that in implementing the amended property mitigation plan's proposal, Agency did not act consistently with the national contingency plan's requirements that Agency perform a "remedial investigation 'to determine the nature and extent of the threat presented by the release' " (*Wash. State Dept. of Transp. v. Natural Gas Co., supra,* 59 F.3d at p. 803, italics omitted; 40 C.F.R. § 300.430(d)(4) (2002)) and prepare a feasibility study (40 C.F.R. § 300.430(e)(2)(i) & (e)(7) (2002)). However, the record indicates Agency effectively complied with those requirements of the national contingency plan. Specifically, Agency conducted a remedial investigation and feasibility study to "assess site conditions and evaluate alternatives to the extent necessary to select a remedy." (*Id.,* § 300.430(a)(2) (2002).) Agency also performed a complete "[s]coping" of the Property to "[a]ssemble and evaluate existing data on the site" and "[d]evelop a conceptual understanding of the site" (*id.,* § 300.430(b)(1) & (2) (2002)); conducted a phase I environmental site assessment; asked Army to collect additional environmental data at the Property; and did assessments before completing remediation. Agency undertook all those actions with the County Department's collaboration and approval.

Further, Agency worked with the County Department to create the master work plan. After considering the needs of the redevelopment project, the master work plan described the only feasible remedial methods as (1)

excavation and disposal of contaminated soil or (2) reuse of contaminated soils if locations were available onsite. (40 C.F.R. § 300.430(e)(7), criteria (ii) (2002).) Agency's amended property mitigation plan also discussed the remedial method ultimately selected. With the County Department's collaboration and approval, Agency's master work plan and/or its amended property mitigation plan identified cleanup levels for soil remaining onsite and soils that needed to be removed offsite for disposal.[9] Moreover, consistent with the national contingency plan's requirement, Agency considered "applicable or relevant and appropriate requirements" for each contaminant of concern and incorporated into its remedial actions at the Property a state cleanup standard more restrictive than required by federal guidelines. (*Id.*, §§ 300.430(e)(9)(iii), criteria (B), 300.5) Specifically, as directed by the County Department, Agency took action consistent with California Code of Regulations, title 27, sections 20090, subdivision (d), 20200, 20210 and 20220—regulations requiring that once soil contaminated with waste was excavated from the Property, Agency had to dispose of that soil as regulated material.

Also without merit is Army's contention that Agency's implementation of its amended property mitigation plan's proposal to remediate lead-impacted soil containing contaminants in concentrations below the action levels set in the master work plan was unnecessary for human health and inconsistent with the national contingency plan. Agency's remedial actions were proper. Agency's master work plan and its amended property mitigation plan were both designed to protect the health and safety of construction workers and to prepare the Property for future use. The cleanup level of lead identified in the master work plan represented the concentration of lead that could remain safely onsite if located in soil that would not be disturbed or handled by anyone. However, soil with lead contamination in concentrations below the level identified in the master work plan presented a health risk to construction workers. Thus, even though quantification of that risk was difficult due to uncontrollable variables, Agency's amended property mitigation plan approved by the County Department proposed a cleanup level of lead-impacted soil to background levels. That proposal in the amended property mitigation plan was consistent with the national contingency plan's suggestion that remedial goals be "intended to protect currently exposed individuals as well as those who potentially may be exposed in the future." (55 Fed.Reg. 8666, 8717 (Mar. 8, 1990).) Hence, although consistent with state waste

---

[9]As noted, the master work plan was available for public comment. Agency also conducted a public hearing to discuss the proposed remediation and the adoption of the master work plan. Further, Army was provided with the property mitigation plan and its amendment. Nevertheless, Army did not provide any comments on the plans. Instead, Army remained silent throughout the entire process.

handling regulations requiring disposal of soil with slight contamination levels, Agency's actions in establishing cleanup levels to protect workers and future users of the Property were also consistent with the national contingency plan.[10]

In sum, the record contained ample evidence indicating Agency's actions were not inconsistent with the national contingency plan but instead furthered that plan's goals of implementation of a remedial method providing a cost-effective and permanent solution to protect human health and the environment. Indeed, the County Department's lead environmental health specialist testified Agency's actions were consistent with the national contingency plan. Army made no contrary showing sufficient to meet its burden to demonstrate that Agency's actions were arbitrary and capricious. (*U.S. v. Chapman, supra,* 146 F.3d at pp. 1170-1171; *Wash. State Dept. of Transp. v. Natural Gas Co., supra,* 59 F.3d at p. 802; *U.S. v. Hardage* (10th Cir. 1992) 982 F.2d 1436, 1442.) Accordingly, the superior court properly concluded that even if compliance with the national contingency plan were a prerequisite to recovery of costs under the Polanco Act, substantial evidence indicated the work done by Agency was consistent with that plan. (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479 [243 Cal.Rptr. 902, 749 P.2d 339].)

2

*Army Was a Responsible Party Subject to Liability Under the Polanco Act*

The Polanco Act (Health & Saf. Code, § 33459.4, subd. (a)) provides in relevant part that "if a redevelopment agency undertakes action to remedy or remove, or to require others to remedy or remove, including compelling a responsible party through a civil action, to remedy or remove a release of hazardous substance, any responsible party or parties shall be liable to the redevelopment agency for the costs incurred in the action. . . . The amount of the costs shall include the interest on the costs accrued from the date of expenditure and reasonable attorney's fees and shall be recoverable in a civil action."

For purposes of the Polanco Act, the term "responsible party" is defined by CERCLA. (42 U.S.C. § 9607(a)(1)-(4); *U.S. v. Fleet Factors Corp.* (11th Cir. 1990) 901 F.2d 1550, 1554.) Army concedes it was a responsible party for the petroleum hydrocarbon contamination associated with the underground storage tank. However, asserting the petroleum hydrocarbon contamination and the burn ash contamination were "divisible," Army contends Agency did not meet its burden to prove Army also qualified independently as responsible party for the burn ash contamination. (*U.S. v. Hercules,*

---

[10]Regardless of the Property's future use, removal of soils associated with the underground storage tank used by Army was legally required under state waste disposal regulations.

*Inc.* (8th Cir. 2001) 247 F.3d 706, 716-717.) Army contends that although the owner of a contaminated facility is a responsible party under CERCLA (42 U.S.C. § 9607(a)(1) ["the owner and operator of a vessel or a facility"]), at the time the soil was excavated and removed from the Property, the Property's owner was assertedly Agency, not Army. Specifically, Army contends Agency's remediation action was taken after May 8, 2000, the date Agency took possession of the Property. However, the present owner of a facility is the entity owning the facility at the time the lawsuit is filed. (*U.S. v. Fleet Factors Corp., supra,* at p. 1554.) In February 2000 when this lawsuit was filed, Army owned the Property. Moreover, Agency did not become the owner until it took fee title to the Property under the court's final order of condemnation entered in March 2001, well after Agency's remediation work was done. As noted, the Polanco Act (Health & Saf. Code, § 33459.1, subd. (a)(1)) expressly authorized Agency to take any action that it determined to be necessary and that was consistent with other state or federal laws "to remedy or remove a release of hazardous substances on, under, or from" the Property regardless whether Agency owned the Property "or not." As the Property's current owner, Army was liable even if it did not cause the contamination. (*State of N.Y. v. Shore Realty Corp.* (2d Cir. 1985) 759 F.2d 1032, 1044-1046.)

B

*Agency Satisfied Condition Precedent for Recovery of Costs Under the Polanco Act*

The Polanco Act (Health & Saf. Code, § 33459.1, subds. (a)(1) & (b)) requires that before taking its own action to remedy or remove a release of hazardous substances on property within a redevelopment project area, a redevelopment agency must first give the responsible party a notice asking that party to submit a proposed remedial action plan within the statutory-established deadline. Conceding Agency followed that statutory notification procedure with respect to the release from the underground storage tank, Army contends it responded affirmatively to Agency's notice and performed all requested work. However, Army contends that when the release of lead-contaminated burn ash was later discovered, Agency did not ask Army to submit a proposed remedial action plan for the burn ash release but instead proceeded on its own to investigate that release, excavate contaminated soil in the construction envelope and dispose of the contaminated soil as waste. Thus, Army concludes the superior court should have denied Agency's Polanco Act claim for recovery of costs incurred in remediating the lead-impacted burn ash release because Agency never asked Army to submit a timely proposed remedial action plan for that specific release.

However, the record contained evidence showing Agency gave Army the statutorily required notice to submit a proposed remedial action plan for contamination at the Property within the statutory deadline but Army simply failed to respond. Accordingly, Agency was entitled to recover from Army the costs incurred by Agency in performing remediation work at the Property, including the excavation and disposal of lead-contaminated soil.

Contrary to Army's contention, after Army failed to respond to Agency's Polanco Act notice requesting timely submission of a proposed remedial action plan at the Property, nothing in the Polanco Act required Agency to serve Army with a new statutory notice requesting submission of a proposed remedial action plan specifically as to the lead-contaminated soil. On the contrary, the Polanco Act (Health & Saf. Code, § 33459.1, subds. (a)(1) & (b)) provided that once Army did not timely respond to Agency's statutory notice, Agency could properly take "any actions" that Agency determined necessary and that were consistent with other state and federal laws "to remedy or remove a release of hazardous substances" on the Property. Thus, as the superior court properly concluded, Army did not discharge its obligation under the Polanco Act to submit a timely proposed remedial action plan simply by retaining contractors who removed the underground storage tank more than one year after the deadline for Army to respond to Agency's statutory notice.

## C

*Army Was Not Entitled to Litigation Costs or Attorney Fees*

 Army contends it was entitled to litigation costs and attorney fees as a component of "just compensation" since Agency sought cost recovery under the Polanco Act in this lawsuit that also contained a cause of action for eminent domain. Specifically, citing *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 375 [27 Cal.Rptr.2d 613, 867 P.2d 724], Army contends that as the Property's owner, it was constitutionally and statutorily entitled to the costs of defending against Agency's eminent domain claim as well as costs incurred in defending against Agency's Polanco Act claim that were assertedly " 'necessarily incidental to the trial of the issues' " of both claims. (*Ibid.*; Cal. Const., art. I, § 19; Code Civ. Proc., § 1268.710.) Army also contends it complied with the procedural requirements to recover its litigation costs and attorney fees by timely demanding compensation of $500,000 "net of the Polanco Redevelopment Act recovery" in May 2001, more than 20 days before the trial date. (Code Civ. Proc., § 1250.410.) Army concludes its demand for compensation would have been "reasonable" as a matter of law if Agency's waste disposal costs had not been allowed as an offset.

However, Army's assertion of entitlement to recover its litigation costs and attorney fees is meritless.

First, as Agency asserted in objecting to Army's demand for compensation in the trial court, that demand was of no consequence since Agency's eminent domain cause of action had been settled and a final order of compensation filed. Indeed, in February 2001 in settling the eminent domain action, the parties entered into a stipulation incorporated into a court order that the $550,000 total amount of just compensation for Agency's taking of the Property included compensation for all claims Army made or could have made concerning the eminent domain cause of action, expressly including litigation costs and attorney fees. Characterizing that stipulation as resolving the issues of value and entitlement to "pre-stipulation" costs/attorney fees, Army contends the net compensation to be paid to Army remained in dispute and thus, having made a reasonable demand at least 20 days before trial, Army was assertedly entitled to its "post-stipulation" costs/attorney fees. However, Army has not identified anything in the language of the stipulation suggesting Army retained the right to recover any "post-stipulation" or other litigation costs or attorney fees. Hence, on this record Army has waived its claim of entitlement to such fees.

Further, in any event, Army's demand for compensation was untimely as not made at least "20 days prior to the date of the trial on issues relating to compensation." (Code Civ. Proc., § 1250.410, subd. (a).) Although Army's demand was made in May 2001 before the June 2001 trial on Agency's Polanco Act claim, for purposes of Code of Civil Procedure section 1250.410, subdivision (a), that trial was not on issues relating to compensation because the court had already entered an order in accord with the parties' stipulation for judgment as to eminent domain in February 2001. Moreover, since there was no eminent domain claim remaining for litigation, costs incurred by Army at trial on the Polanco Act could no longer, if ever, be considered necessarily incidental to Agency's eminent domain claim. Additionally, Army did not comply with Code of Civil Procedure 1250.410, subdivision (b)'s requirement that the issues of litigation costs and attorney fees be raised by motion. Finally, since the court's award of remediation costs to Agency from Army under the Polanco Act was proper, Army's demand for compensation in eminent domain was ultimately too high to be considered reasonable per se. Accordingly, Army has not demonstrated any reversible judicial error with respect to the issue of its claim of entitlement to recover litigation costs and attorney fees.

# IV

## DISPOSITION

The judgment is affirmed.

McDonald, J., and McIntyre, J., concurred.