[Nos. D047927, D048490. Fourth Dist., Div. One. Aug. 31, 2007.]

REDEVELOPMENT AGENCY OF THE CITY OF SAN DIEGO, Plaintiff and Appellant, v.
AHMAD MESDAQ, Defendant and Appellant.

1114

**COUNSEL**

Best Best & Krieger, Bruce W. Beach and Karen F. Landers for Plaintiff and Appellant.

Thorsnes Bartolotta & McGuire, Vincent J. Bartolotta, Jr., Karen F. Frostrom; Higgs, Fletcher & Mack and John Morris for Defendant and Appellant.

**OPINION**

**IRION, J.**—In an exercise of its power of eminent domain, the Redevelopment Agency of the City of San Diego (the Agency) filed proceedings in the superior court to obtain possession of Ahmad Mesdaq's property (a cigar store and coffee shop) and made available to him $3,091,000 as "probable

compensation." Mesdaq challenged the Agency's authority to take his property, leading to a series of three trials, two before the trial court and one before a jury. At the conclusion of these proceedings, Mesdaq's objections to the taking of his property were overruled, and he was awarded compensation in the amount of $7,785,131.83.

Both Mesdaq and the Agency appeal. The Agency contends that the compensation award must be reversed because it is based on (1) an erroneous valuation date; (2) speculative expert testimony as to lost business goodwill; and (3) an improper award of damages based on the Agency's issuance of an environmental remediation notice under the Polanco Redevelopment Act (Health & Saf. Code, § 33459 et seq. (Polanco Act)). In addition, the Agency contends that the trial court erred in awarding Mesdaq $1,230,714.41 in litigation expenses under Code of Civil Procedure section 1250.410, subdivision (b).[1]

As discussed in greater detail below, we agree with the Agency's contentions. With respect to the first issue, our Supreme Court's recent opinion in *Mt. San Jacinto Community College Dist. v. Superior Court* (2007) 40 Cal.4th 648, 659 [54 Cal.Rptr.3d 752, 151 P.3d 1166] (*Mt. San Jacinto*) compels the conclusion that the trial court erroneously set the date of valuation as the date of trial, rather than the earlier date of deposit, for purposes of the jury trial on compensation. On the second issue, we agree with the Agency that the trial court abused its discretion in permitting expert testimony that relied upon a goodwill valuation methodology that did not value Mesdaq's actual business but instead valued a hypothetical business operating at Mesdaq's facility. Third, we conclude that the trial court's ruling allowing the jury to assess $77,823.83 of precondemnation damages based on the Agency's issuance of a Polanco Act notice was erroneous. As a result of these determinations, the jury's compensation award must be vacated and relitigated. We reverse as well the award of attorney fees to Mesdaq, which was based, in substantial part, on the now vacated award.

On appeal, Mesdaq contends that the trial court erred by failing to find that the Agency's action in taking his property constituted a "gross abuse" of the Agency's discretion and was not in the public interest, and by limiting the evidence that he was permitted to introduce in his challenge to the Agency's actions. We need not reach these contentions because, by statute, Mesdaq has waived his appellate right to challenge the taking of his property by consenting to the withdrawal of the Agency's deposit of "probable compensation" by his lender, First National Bank, to pay off Mesdaq's mortgage.

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise specified.

FACTS

In 2001, Mesdaq purchased a 5,000-square-foot commercial property at 502 J Street in the Gaslamp District of San Diego for $1.3 million. In 2003, after improving the property, Mesdaq opened the Gran Havana—a coffee shop and cigar store.

On April 27, 2004, the Agency adopted a "resolution of necessity," which resolved that the public interest and necessity required that Mesdaq's property be acquired through an exercise of the power of eminent domain, so that a planned 40,000-square-foot hotel could be erected on his and the adjoining properties. Three days later, the Agency filed a complaint in eminent domain with respect to Mesdaq's property. In concert with its complaint, the Agency deposited $3,091,000 as probable compensation for the property and requested an order for possession. After a hearing, the trial court denied Mesdaq's initial objections to the Agency's right to take his property and granted possession to the Agency. At Mesdaq's request, however, the court delayed actual transfer of title to allow Mesdaq to continue operating his business.

The court then held three separate trials with respect to the proposed taking: (1) a court trial regarding whether the Agency engaged in a "gross abuse of discretion" (§ 1245.255, subd. (b)) in adopting its resolution of necessity and whether the taking was for a public use; (2) a court trial regarding Mesdaq's request for precondemnation damages under *Klopping v. City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345] (*Klopping*); and finally (3) a jury trial to determine "just compensation" for the taking of the property. At the conclusion of the first two proceedings, the trial court determined that the Agency had not engaged in a gross abuse of discretion; that the property was taken for a public use; and that the Agency had acted unreasonably by issuing a Polanco Act notice during precondemnation proceedings, and the jury could include damages for that conduct in calculating its compensation award. In the jury trial, Mesdaq was awarded $7,785,131.83 in compensation for the taking. The award consisted of (1) loss of the fair market value of the property of $4,250,000; (2) loss of business goodwill of $3,361,208; (3) loss of furniture and equipment worth $96,100; and (4) precondemnation damages of $77,823.83. The trial court subsequently awarded Mesdaq attorney fees and costs in the amount of $1,230,714.41.

DISCUSSION

I

THE AGENCY'S APPEAL

A

*The Trial Court Erred by Ruling That the Date of Valuation
of the Property Was the Date of Trial*

The Agency contends that the trial court improperly disregarded the statutory requirement that when probable compensation is deposited, the date of valuation for purposes of determining any compensation award is the date of the deposit, not the date of trial. We agree with the Agency under the authority of our Supreme Court's recent decision (*Mt. San Jacinto, supra,* 40 Cal.4th 648) and consequently reverse the jury's award of compensation to Mesdaq.

1. *Applicable Statutory and Constitutional Principles*

■ The starting point for any analysis of eminent domain law is the California Constitution, which states in article I, section 19: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation." The federal Constitution also contains a provision regarding eminent domain, stating that private property shall not "be taken for public use, without just compensation." (U.S. Const., 5th Amend.)

The Legislature has promulgated a "comprehensive statutory scheme" to implement article I, section 19 of the California Constitution, known as the Eminent Domain Law (§ 1230.010 et seq.). (*Escondido Union School Dist. v. Casa Sueños De Oro, Inc.* (2005) 129 Cal.App.4th 944, 959 [29 Cal.Rptr.3d 89] (*Escondido Union*); see § 1230.010 et seq.; cf. *Mt. San Jacinto, supra,* 40 Cal.4th at p. 656 ["There is a 'strong presumption in favor of the Legislature's interpretation of a provision of the Constitution' "].)

■ The Eminent Domain Law delineates two different types of proceedings for the governmental taking of property. The first is a standard condemnation proceeding in which the public agency does not take possession and

title to condemned property until after a jury has awarded just compensation; thus, the "taking" and the "compensation" are contemporaneous and occur at the conclusion of court proceedings. Until then, the property owner bears the risk of loss to the property. (*Redevelopment Agency v. Maxwell* (1961) 193 Cal.App.2d 414, 417–418 [14 Cal.Rptr. 170]; § 1268.030.) The second procedure, a quick-take proceeding, allows a public agency to take possession of a condemned property and the property owner to obtain the probable compensation for that property well in advance of the termination of court proceedings. ■ Under section 1255.010, a public entity may accomplish an early taking of property by making a deposit of the "probable amount of compensation" at any time prior to entry of judgment. The amount of the deposit must be based on an appraisal of an expert qualified to express an opinion as to the value of the property and must be supported by a written statement of, or summary of the basis for, the appraisal. (§ 1255.010, subd. (b).)[2] After a deposit of probable compensation has been made, the court may order that possession of the property be transferred to the condemner, after considering any opposition from the owner of the property and making certain findings regarding the public entity's legal right to take the property and the relative hardships that would befall the parties were title not transferred until after legal proceedings are completed. (§ 1255.410.) Once the deposit is made, the property owner can apply to withdraw "all or any portion of the amount deposited," and the court "shall order the amount requested in the application, or such portion of that amount as the applicant is entitled to receive, to be paid to the applicant." (§§ 1255.210, 1255.220.)

■ While the valuation date in standard condemnation proceedings " 'is either the date of commencement of proceedings, or of commencement of trial (§§ 1263.120, 1263.130), a different rule applies in quick-take situations. There, the land is to be valued as of the date of the deposit of estimated value which permits an order for early possession. (§ 1263.110.)' " (*Escondido Union, supra,* 129 Cal.App.4th at p. 960, quoting *Redevelopment Agency v. Gilmore* (1985) 38 Cal.3d 790, 800–801 [214 Cal.Rptr. 904, 700 P.2d 794]; cf. *Metropolitan Water Dist. of So. California v. Campus Crusade for Christ, Inc.* (2007) 41 Cal.4th 954, 963 [62 Cal.Rptr.3d 623, 161 P.3d 1175] (*Metropolitan Water*) ["On December 23, 1996, MWD deposited funds into the State Treasury, thereby setting the date of valuation"].) These valuation provisions " 'give effect to the fact that, except for defenses to the exercise of eminent domain, a landowner in California is permanently deprived of all of

---

[2] The statement must contain "detail sufficient to indicate clearly the basis for the appraisal," including: "(A) The date of valuation, highest and best use, and applicable zoning of the property. [¶] (B) The principal transactions, reproduction or replacement cost analysis, or capitalization analysis, supporting the appraisal. [¶] (C) If the appraisal includes compensation for damages to the remainder, the compensation for the property and for damages to the remainder separately stated, and the calculations and a narrative explanation supporting the compensation, including any offsetting benefits." (§ 1255.010, subd. (b).)

his rights in property sought by a public agency when the agency exercises its option to deposit estimated value and obtain early possession for the intended public use.' " (*Escondido Union*, at p. 960, quoting *Gilmore*, at p. 801; see § 1263.110 [if the public entity "deposits the probable compensation in accordance with" the statutory procedures, "the date of valuation is the date on which the deposit is made"].)

■ Additional "statutory procedural safeguards" apply to the determination of probable compensation in quick-take proceedings. (*Mt. San Jacinto*, *supra*, 40 Cal.4th at p. 660.) For example, at any time after a deposit has been made, the trial court shall, upon motion of any party with an interest in the property, "determine or redetermine whether the amount deposited is the probable amount of compensation that will be awarded in the proceeding." (§ 1255.030, subd. (a).)[3] In ruling on the motion, the "court may order the plaintiff to increase the deposit or may deny the plaintiff possession of the property until the amount deposited has been increased to the amount specified in the order"; or if possession has already transferred "order the amount deposited to be increased to the amount determined to be the probable amount of compensation," and if the plaintiff does not comply, dismiss the action and award litigation costs and damages to the defendant. (§ 1255.030, subds. (b), (c).)

## 2. *Procedural Background*

The Agency employed the quick-take procedures under the Eminent Domain Law in the instant case. On April 30, 2004, the Agency filed, along with its complaint in eminent domain and application for an order of possession, a "Request for Deposit." The Agency included with its filing a "notice of deposit and summary of the basis for the appraisal" and attached the appraisal reports of two certified real estate appraisers valuing Mesdaq's property at over $3 million. Mesdaq objected to the application for possession, contending that his objections to the Agency's right to take his property must be heard before any transfer of possession, and informing the court that he has "an active, thriving business, and his revenues increase every month." Mesdaq also objected that the Agency was not entitled to possession because

---

[3] A motion seeking redetermination "shall be supported with detail sufficient to indicate clearly the basis for the motion, including, but not limited to, the following information . . . : [¶] (1) The date of valuation, highest and best use, and applicable zoning of the property. [¶] (2) The principal transactions, reproduction or replacement cost analysis, or capitalization analysis, supporting the motion. [¶] (3) The compensation for the property and for damages to the remainder separately stated, and the calculations and a narrative explanation supporting the compensation, including any offsetting benefits." (§ 1255.030, subd. (a).) A public entity, however, is not required to make a motion to *increase* the deposit, but "may at any time increase the amount deposited without making a motion under this section." (§ 1255.030, subd. (f).)

the deposit was not sufficient in that it included a deduction for "environmental remediation" and did not include compensation for lost goodwill.

At a hearing on these contentions, the trial court implicitly found that the amount of the deposit was sufficient and postponed its decision on the Agency's request for an order of possession. At the subsequent hearing, the trial court granted Mesdaq's request to delay decision on the Agency's request for possession until December 28, 2004, to enable it to first rule on Mesdaq's objections to the taking. The court then issued an order that: "AGENCY shall make a deposit of probable compensation with the County Treasury in the amount of $3,091,000," at which time, pursuant to section 1255.410, it would be empowered to take exclusive possession of the property.[4] Mesdaq did not file a motion seeking determination or redetermination of the deposit amount under section 1255.030, subdivision (a).

Immediately prior to trial, the court determined that the date of trial, not the statutorily determined date of deposit, would be the date of valuation. The court reasoned rising property values and delays in concluding the proceedings necessitated a later valuation date to enforce the constitutional mandate of just compensation, citing *Saratoga Fire Protection Dist. v. Hackett* (2002) 97 Cal.App.4th 895, 905–906 [118 Cal.Rptr.2d 696] (holding that where necessary to enforce the California Constitution's requirement of just compensation for a taking, courts can disregard statutory eminent domain requirements). The parties and the trial court recognized that the court's ruling on the date of valuation was a "critical issue" for purposes of determining the compensation award.

3. *The Trial Court Erred in Disregarding Section 1255.010 in Setting the Date of Valuation*

We begin our analysis by noting that the factual and procedural posture of the instant case is indistinguishable in any salient respect from that recently considered by our Supreme Court in *Mt. San Jacinto*. In that case, the condemner deposited the probable amount of compensation supported by an appraisal, and the deposit was deemed sufficient "probable compensation" by the trial court. (*Mt. San Jacinto, supra,* 40 Cal.4th at p. 662.) The trial court nevertheless subsequently ruled that given increasing property values, the statutory date of valuation should not control and that the date of valuation would be the date of trial, resulting in a significant increase in the amount of

---

[4] As noted earlier, the trial court delayed the Agency's actual physical possession of the property until December 28, 2004. The transfer of physical possession was further delayed in subsequent rulings.

compensation awarded. The Court of Appeal reversed, and our Supreme Court affirmed the appellate court's ruling.[5]

■ In evaluating contentions virtually identical to those raised here, our high court recognized that in certain circumstances, as in the *Saratoga* case relied on by the trial court, a court may deem a statutory provision regulating eminent domain "unconstitutional as applied," and disregard the provision in favor of an alternative procedure that ensures adequate compensation. (*Mt. San Jacinto, supra,* 40 Cal.4th at p. 661.) The court clarified, however, that such action is not called for in a quick-take proceeding where a public entity has made a deposit of probable compensation for the property. (*Id.* at pp. 661, 662 [emphasizing that "it is of critical importance that *Saratoga* was a straight condemnation proceeding where there was no deposit of probable compensation before trial" and distinguishing *Kirby Forest Industries, Inc. v. United States* (1984) 467 U.S. 1, 17 [81 L.Ed.2d 1, 104 S.Ct. 2187] on same grounds]; *City of Santa Clarita v. NTS Technical Systems* (2006) 137 Cal.App.4th 264, 273 [40 Cal.Rptr.3d 244] (*NTS Technical*) [rejecting reliance on *Saratoga* where that case was "factually inapplicable for the reasons that it was a straight condemnation, not a quick-take action and, unlike here, there was no deposit of probable compensation"].) In a quick-take proceeding, the constitutional requirement that an owner receive "just compensation" does not support a court's decision to disregard the statutory mandate because, under the state Constitution itself, "just compensation" is made available to the owner at the time of the deposit. (*Mt. San Jacinto,* at p. 662.) Consequently, in the words of our Supreme Court, "[n]o credible reason exists to invalidate the statutory date of valuation . . . when a deposit was made before trial and the owner had access to the money at that time." (*Ibid.*)

Mesdaq contends that *Mt. San Jacinto* is distinguishable on two grounds.[6] First, he argues that in *Mt. San Jacinto,* "there was a judicial determination that the amount deposited was probable compensation," and in Mesdaq's case "the Agency did *not* seek such a determination" and instead "took a calculated gamble in not filing such a motion." This argument fails because it misconstrues both the statutory framework and the procedural history of this case.

---

[5] In fact, the property owner in *Mt. San Jacinto* was in a stronger position to challenge the statutory valuation date than Mesdaq because there the property owner had, in fact, exercised its statutory right to seek redetermination of the "probable compensation" deposit (albeit unsuccessfully) whereas here, Mesdaq failed to invoke the statutory provision that would have triggered the right to redetermination. (*Mt. San Jacinto, supra,* 40 Cal.4th at pp. 654–655.)

[6] *Mt. San Jacinto* was decided after the parties had briefed the instant appeal, and consequently we requested, and the parties provided, supplemental briefing regarding the implications of that decision.

■ Under the quick-take statutory framework, once the Agency, in accordance with section 1255.010, deposited its estimate of probable compensation and supported that estimate with expert appraisals and a written summary of the basis for the appraisal (§ 1255.010, subd. (b)), it was not required to make any further motion seeking a determination that its deposit was adequate. Having followed the *procedural* requirements of section 1255.010, the Agency triggered section 1263.110, which commands that "if the plaintiff deposits the probable compensation" in accordance with section 1255.010, "the date of valuation is the date on which the deposit is made." (§ 1263.110, subd. (a).) Contrary to Mesdaq's contention, this valuation provision is not conditioned upon a trial court finding that the deposit was adequate; it applies *unless* "the court determines pursuant to Section 1255.030 that the probable amount of compensation exceeds the amount previously deposited." (§ 1263.110, subd. (b).) Here, the trial court never made such a determination, and indeed Mesdaq never requested it do so by moving under section 1255.030 for a determination of the deposit's adequacy. (§ 1255.030 [conditioning trial court determination of adequacy of deposit "upon motion . . . of any party"]; see *NTS Technical, supra,* 137 Cal.App.4th at pp. 273–274 [rejecting contention that deposit date was not appropriate date of valuation because "if appellants believed that the 'probable compensation' was an amount greater than the original deposit, they could have made a motion for redetermination of the appropriate amount of deposit, which they elected not to do"].)

Mesdaq's efforts to distinguish *Mt. San Jacinto* are particularly unconvincing because despite Mesdaq's failure to properly invoke section 1255.030, the trial court nevertheless considered his informal challenges to the adequacy of the deposit and rejected them, thereby placing this case squarely within the holding of *Mt. San Jacinto.* As noted earlier, the trial court, in fact, found that the Agency's deposit was adequate, at first tentatively at a hearing addressing that issue and then definitively in a subsequent written order that the "AGENCY shall make a deposit of probable compensation with the County Treasury in the amount of $3,091,000."

■ Mesdaq's second argument is that *Mt. San Jacinto* does not apply because the case "does not speak at all to the effect of . . . section 1263.130." Mesdaq contends section 1263.130 controls here because it separately sets the date of valuation as the date of trial if the "issue of compensation is not brought to trial within one year after the commencement of the proceeding" and any delay was not the fault of the defendant. (§ 1263.130.) This argument fails because section 1263.130 is explicitly "[s]ubject to Section 1263.110"— the provision that sets the date of valuation as the date of deposit in a quick-take procedure. Thus, as the Law Revision Commission comment to the statute makes clear, section 1263.130 establishes the date of valuation only

"where that date is not established by an earlier deposit (Section 1263.110)." (Cal. Law Revision Com. com., 19A West's Ann. Code Civ. Proc. (1982 ed.) foll. § 1263.130, p. 18.)[7]

█ In sum, *Mt. San Jacinto* is not distinguishable and we must therefore follow our Supreme Court's unambiguous instruction that: "Where, as here, a deposit of probable compensation is made, and the trial court determines that the deposit equals or exceeds the probable amount of the owner's just compensation, the property *must* be valued on the date of the deposit." (*Mt. San Jacinto, supra,* 40 Cal.4th at p. 666, italics added; see also *NTS Technical, supra,* 137 Cal.App.4th at p. 273 [trial court properly ruled that date of valuation was date of deposit even though condemner later voluntarily increased deposit to more accurately reflect probable compensation].) The trial court, thus, erred in disregarding the statutory requirement under section 1263.110 that the date of valuation is the date of deposit and the award of just compensation, which is based on the erroneous valuation date, must be reversed.[8]

B

*The Trial Court Erred in Permitting Speculative Testimony Regarding the Value of Lost Goodwill*

The Agency contends that the trial court also erred by allowing an expert witness to testify to his conclusion that Mesdaq lost over $3.3 million in foregone business goodwill by virtue of condemnation. The Agency contends the expert's calculations, and thus his testimony, did not represent the goodwill actually lost based on the taking of Mesdaq's business, but rather represented speculative goodwill lost for a hypothetical alternative business.

1. *Mesdaq's Expert Testimony Regarding Lost Business Goodwill*

Mesdaq presented an expert, Nevin Sanli, to testify regarding the business goodwill lost as a result of the taking of Mesdaq's business. Prior to Sanli's testimony, the trial court granted the Agency's in limine motion precluding

---

[7] Section 1263.130 states: "Subject to Section 1263.110, if the issue of compensation is not brought to trial within one year after commencement of the proceeding, the date of valuation is the date of the commencement of the trial unless the delay is caused by the defendant, in which case the date of valuation is the date of commencement of the proceeding."

[8] Mesdaq contends in supplemental briefing that should this court reverse the just compensation award, we should include "directions to enter a new judgment in favor of Mesdaq for $1 million less than the present judgment" because "the parties agreed at trial" to this remedy. We see no need to include such directions as the parties, if they so desire, can elect to stipulate to the amount of just compensation on remand.

any testimony as to lost goodwill that was based not on Mesdaq's actual operations but rather on hypothetical uses of the property. Immediately prior to and throughout Sanli's testimony there were objections and subsequent discussions between counsel and the court regarding the implications of the court's in limine ruling. During these discussions, Sanli and Mesdaq's counsel assured the court that Sanli's testimony solely concerned the facilities and operations that currently existed, and consequently the court permitted Sanli to testify. The court emphasized, however, that "hypothetical restaurant evidence is not coming in."

At trial, Sanli testified that Mesdaq lost over $3.3 million in business goodwill as a result of the taking of the Gran Havana—a business Sanli characterized as an "eating and drinking establishment" (as opposed to "a restaurant") that sold "cigars and . . . nonrestaurant items," as well as hot and cold beverages and premade food items, such as pastries, sandwiches and salads.

Sanli explained that in reaching his opinion, he attempted to determine the "fair market value" of the business, which he defined as the "highest price on the date of valuation," in light of "all uses of the facility" to which it is "reasonably adaptable"—in essence, the value of a business at Mesdaq's location that engaged in the "highest and best use" of Mesdaq's existing facilities.[9]

Sanli relied on the discounted cash flow methodology, projecting Mesdaq's future profits and then discounting those profits to a present value. To project future profits (essentially, projected gross sales minus projected expenses), Sanli first reviewed the existing financial statements for the almost three years the Gran Havana had been in operation, noting that 2003 (annualized) sales were $676,000; 2004 sales were $947,000; and 2005 (annualized) sales were $1,154,000.[10] Sanli then projected future sales by creating "representative" income statements for years 2005 and 2006. Instead of simply relying on 2005's actual annualized sales of just over $1 million for purposes of valuation, he projected 2005 sales to be $3.1 million. Sanli acknowledged

---

[9] This familiar terminology that Sanli utilized in his testimony traditionally refers to the measure of constitutionally required "just compensation" for property taken, not the statutorily required value of lost business goodwill. (See, e.g., *San Diego Metropolitan Transit Development Bd. v. Cushman* (1997) 53 Cal.App.4th 918, 925 [62 Cal.Rptr.2d 121] [explaining that constitutionally required "measure of just compensation is the fair market value of the property" defined as " 'the highest price on the date of valuation that would be agreed to by a seller . . . *with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available*' " (quoting §§ 1263.320, subd. (a), 1263.310) and "the highest and best use for which the property is geographically and economically adaptable"].)

[10] Because the Gran Havana was not open for the full year in either 2003 or 2005, Sanli annualized sales for those years based on the partial data that existed.

that "my projections" were the reason sales jumped from $1 million to $3 million in 2005, "not something [Mesdaq] did."

Sanli arrived at the 2005 figure by breaking down the potential sales into approximately $1.3 million in projected nonrestaurant sales and approximately $1.7 million in projected restaurant sales. While the nonrestaurant sales were tied to Mesdaq's historical sales, Sanli explained the restaurant sales projections were not, but rather were a product of the number of seats that Mesdaq had available multiplied by the median sales per seat in a comparably sized California restaurant: $9,000 in food sales and $2,140 in beverage sales.[11]

Utilizing a projected growth rate, Sanli next determined that 2006 sales (restaurant and nonrestaurant) would grow to $3.25 million, with sales plateauing at that figure for the foreseeable future. Sanli freely acknowledged the 2005 and 2006 calculations were not grounded in historical data but were based on "[w]hat the business would have done with a better use . . . of its resources," and were obtained by "maximizing sales" at the Gran Havana.[12]

At the conclusion of Sanli's testimony, the court denied the Agency's motion to strike the testimony, and later denied the Agency's request for a new trial on the ground that the testimony was based on speculative calculations. The court recognized that the admission of Sanli's testimony was a "close call" but determined that it was too late to strike the testimony. The court stated: "I welcome the Court of Appeal to scrutinize this and sort it out rather than have me mess with it again."

## 2. *Applicable Legal Principles*

 By statute, the owner of a business on a condemned property is entitled, after establishing certain preconditions, to be compensated for the

---

[11] As noted, the discounted cash flow methodology relies on the discounted value of future profits, not sales. Sanli thus further calculated projected future *profits* by subtracting projected future expenses from his sales projections. Sanli's calculation of future expenses is not challenged on appeal nor is his discount rate, and thus we discuss only his projected sales calculations here, which are contested.

[12] After the Agency objected to Sanli's testimony as to the projected sales, the court held a bench conference at which Sanli explained that he was not valuing the Gran Havana as a hypothetical restaurant, but rather was valuing "the existing operation expanding into selling more food items"; "[t]hey have all the equipment they need to do the projections I'm mentioning." Sanli explained, "I took the amount of seats he has available and the number of tables he has available, and I multiplied that by sales you do at a seat" based on "industry statistics on eating and drinking establishments."

"loss of goodwill" that results from a taking.[13] (§ 1263.510, subd. (a).) The statute defines " 'goodwill' " as "the benefits that accrue to a business as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage." (§ 1263.510, subd. (b).) Compensation for loss of " 'business goodwill' " is a statutory, not constitutional, requirement. (*Barthelemy v. Orange County Flood Control Dist.* (1998) 65 Cal.App.4th 558, 566 [76 Cal.Rptr.2d 575] (*Barthelemy*).)

The statute does not provide any guidance as to how the value of lost goodwill should be calculated. Consequently, the courts have recognized that "there is no single method by which to measure goodwill" (*Barthelemy, supra*, 65 Cal.App.4th at p. 567) and that " ' "[e]ach case must be determined on its own facts and circumstances . . . ." ' " (*Redevelopment Agency of San Diego v. Attisha* (2005) 128 Cal.App.4th 357, 368 [27 Cal.Rptr.3d 126].) Nevertheless, the evidence presented to a jury regarding lost goodwill " ' "must be such as legitimately establishes value" ' " (*Attisha*, at p. 368) and "generally represents the present value of the anticipated profits of the business." (*Barthelemy*, at p. 567; see *People ex rel. Dept. of Transportation v. Leslie* (1997) 55 Cal.App.4th 918, 922 [64 Cal.Rptr.2d 252] ["Goodwill may be measured by the capitalized value of the net income or profits of a business or some similar method of calculating present value of anticipated profits"].) In other words, while there are no explicit statutory requirements regarding an expert's use of a particular methodology for valuing lost goodwill, the expert's methodology must provide a fair estimate of *actual* value and cannot be based on hypothetical or speculative uses of a con-demned business. (See *County of San Diego v. Rancho Vista Del Mar, Inc.* (1993) 16 Cal.App.4th 1046, 1059 [20 Cal.Rptr.2d 675] (*Rancho Vista Del Mar*) ["a property owner may not value his property based upon its use for a projected special purpose or for a hypothetical business"]; *City of Stockton v. Albert Brocchini Farms, Inc.* (2001) 92 Cal.App.4th 193, 198 [111 Cal.Rptr.2d 662] ["when a valuation expert employs an unsanctioned methodology, the opinion may be excluded in part or in whole in the discretion of the trial court"].)

In addition, a trial court has a special obligation to oversee the admission of expert testimony and, where an objection has been made, "shall" exclude "testimony in the form of an opinion that is based in whole or in significant

---

[13] The owner is only entitled to an award of goodwill if he or she proves: "(1) The loss is caused by the taking of the property . . . . [¶] (2) The loss cannot reasonably be prevented by a relocation of the business or by taking steps and adopting procedures that a reasonably prudent person would take and adopt in preserving the goodwill. [¶] (3) Compensation for the loss will not be included in payments [for moving expenses otherwise mandated by law]. [¶] (4) Compensation for the loss will not be duplicated in the compensation otherwise awarded to the owner." (§ 1263.510, subd. (a).)

part on matter that is not a proper basis for such an opinion." (Evid. Code, § 803.) A challenge to the trial court's admission or rejection of expert testimony regarding the calculation of lost goodwill is reviewed for abuse of discretion. (*People ex rel. Dept. of Transportation v. Clauser/Wells Partnership* (2002) 95 Cal.App.4th 1066, 1073 [116 Cal.Rptr.2d 240].)

### 3. *Analysis*

In the instant case, we agree with the Agency that the trial court abused its discretion in allowing Sanli's testimony regarding the value of goodwill lost by virtue of the taking of the Gran Havana to be presented to the jury. The trial court was obligated to exclude the testimony under Evidence Code section 801 and pursuant to its role of "limiting the permissible arena in condemnation trials." (*Sacramento, etc. Drainage Dist. ex rel. State Reclamation Bd. v. Reed* (1963) 215 Cal.App.2d 60, 69 [29 Cal.Rptr. 847] (*Reed*) ["To say that all objections to [an expert's] reasons go to weight, not admissibility, is to minimize judicial responsibility for limiting the permissible arena in condemnation trials. The responsibility for defining the extent of compensable rights is that of the courts"]; see *City of San Diego v. Sobke* (1998) 65 Cal.App.4th 379, 395 [76 Cal.Rptr.2d 9] (*Sobke*) [same]; Evid. Code, § 801; *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1523 [3 Cal.Rptr.2d 833] ["the courts have the obligation to contain expert testimony within the area of the professed expertise, and to require adequate foundation for the opinion"]; cf. *Metropolitan Water, supra*, 41 Cal.4th at p. 968 [recognizing in a related context that before evidence establishing value can be presented to the jury, that evidence " ' "must at least be in accordance with the usual minimum evidentiary requirements, and that which is purely speculative, wholly guess work and conjectural, is inadmissible" ' "].)

Under section 1263.510, the lost goodwill for which a business owner must be compensated is defined as the intangible "benefits that accrue to a business" as a result of that business's particular characteristics that would enable the business to retain existing customers and acquire new ones. (§ 1263.510, subd. (b).) Under this definition, a legal methodology for valuing lost goodwill in the instant case would include any valid measurement of the future anticipated profits at the Gran Havana. (*People ex rel. Dept. of Transportation v. Muller* (1984) 36 Cal.3d 263, 271 [203 Cal.Rptr. 772, 681 P.2d 1340] (*Muller*) ["goodwill may be measured by the capitalized value of the net income or profits of a business or by some similar method of calculating the present value of anticipated profits"]; cf. *Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 704 [66 Cal.Rptr.2d 630, 941 P.2d 809] [in determining compensation for a taking, "the landowner is to be 'put in as good position pecuniarily as he would have occupied if his property had not been

taken.' [Citation.] 'He must be made whole but is not entitled to more' "].) Mesdaq's expert, however, did not calculate the value of anticipated profits at the Gran Havana, but rather valued anticipated profits of a different business—a hypothetical business that *could* have existed on the Gran Havana's site had the business owner better utilized the facility, or in Sanli's words, "[w]hat [Mesdaq's] business would have done with a better use . . . of its resources . . . ."

Sanli's valuation of an idealized version of what Mesdaq's business should have been turned the principles of section 1263.510—a desire to compensate a business owner for the unique attributes of a condemned business—on its head by valuing not the particular characteristics of Mesdaq's business, but those of a better, maximized business. As Sanli explained, his calculations of "representative" restaurant income for 2005 and 2006 (the basis for the future income stream that would then be discounted to determine present value of anticipated profits) were related to Mesdaq's *actual business* operation only by virtue of the classification of the business as a "restaurant" and by reference to the number of available seats. Sanli did not determine whether Mesdaq was actually filling all of his seats or how much *Gran Havana* earned per seat, but simply multiplied the per-seat sales of a hypothetical median California restaurant ($9,000 + per seat) by the number of seats Mesdaq had "available." (Cf. *Muller, supra,* 36 Cal.3d at p. 271, fn. 7 ["Goodwill must, of course, be measured by a method which excludes the value of tangible assets or the normal return on those assets"].) Compounding this methodological error was the fact that, as the trial court ruled and Sanli acknowledged, Mesdaq's business was not actually a "restaurant," and did not have a liquor license, and thus calculating anticipated profits by reference to sales at restaurants generally, including those with liquor licenses, introduced further speculation into the calculations.[14] (See *In re Marriage of Foster* (1974) 42 Cal.App.3d 577, 584 [117 Cal.Rptr. 49] ["a proper means of arriving at the value of . . . goodwill contemplates any legitimate method of evaluation that measures its present value by taking into account *some past result*" (italics added); cf. *Muller, supra,* 36 Cal.3d at p. 271, fn. 7 [citing *Foster* as authority for valuation of goodwill in eminent domain context].)

As the goodwill statute does not contemplate compensation for hypothetical or potential as opposed to *actual* goodwill lost, the trial court should not have permitted Sanli to testify to a goodwill value determined by creating a future income stream not tied to Mesdaq's actual business operations. The 2005 and 2006 restaurant sales used to determine the future income streams

---

[14] Further calling into question whether Sanli's projections, which provided exponential growth for both cigar sales and restaurant sales at Gran Havana, were realistic was the fact that, as Sanli acknowledged, California law restricts the degree to which smoking and eating activities can be combined within the same facility.

to be discounted were based not on expected growth in Mesdaq's historical earnings, but represented anticipated profits from an "imaginative" better use of Mesdaq's existing facility. (*Reed, supra*, 215 Cal.App.2d at p. 69 [trial court should exclude "imaginative claims" of experts in eminent domain proceedings because "[a] condemnation trial is a sober inquiry into values, designed to strike a just balance between the economic interests of the public and those of the landowner"].)[15]

In sum, Sanli approached the valuation of Mesdaq's business "as a laboratory exercise rather than as an empirical measure of what actually existed." (*Sobke, supra*, 65 Cal.App.4th at p. 398; see Evid. Code, § 801; *Rancho Vista Del Mar, supra,* 16 Cal.App.4th at p. 1059 ["a property owner may not value his property based upon its use for a projected special purpose or for a hypothetical business"]; *San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 533 [86 Cal.Rptr.2d 473] ["mere expectation is not one which is compensable in an inverse condemnation proceeding"].) Such testimony is improper, and the trial court abused its discretion by permitting it. (See *Sobke*, at p. 398 ["By attempting to predict [the business's] profitability without calculating and verifying its actual revenues, expenses and profits, [the expert] accomplished nothing toward the goal of determining the existence and true measure of any goodwill. Thus, since not based upon a quantified and verified comparison of patronage-related benefits accruing to the business . . . , [the expert's] testimony about the value of loss of goodwill did not meet the statutory requirements for admissibility as an expert opinion"].) Consequently, the jury's award of lost goodwill, which adopted Sanli's erroneous calculation of value, must be reversed.[16]

---

[15] Mesdaq was entitled to be compensated not solely for the loss of his existing business ("probable retention of old . . . patronage"), but also for anticipated growth of that business ("probable . . . acquisition of new patronage"). (§ 1263.510, subd. (b).) Consequently, Sanli was permitted to use (and did use) a growth rate to calculate the Gran Havana's anticipated revenues as those revenues increased in future years. The error in Sanli's calculations was not the use of a growth rate, but rather Sanli's application of that growth rate to the revenues of a *hypothetical* business rather than the revenues of the *actual* business being valued.

[16] In an opinion issued after argument in the current appeal, our colleagues in the Second District affirmed a trial court's admission of expert goodwill testimony that disregarded the lack of profit at a condemned business in concluding that the business owner lost $410,271 in goodwill because of condemnation. (*Inglewood Redevelopment Agency v. Aklilu* (2007) 153 Cal.App.4th 1095, 1104 [63 Cal.Rptr.3d 684].) In supplemental briefing, Mesdaq contends that *Inglewood* supports the admission of Sanli's testimony. In *Inglewood*, the goodwill valuation expert utilized a " 'cost to create' " approach to establish an estimate of lost goodwill. Under this approach, the expert calculated the value of the *actual* "cost [the business owner] had expended over the [life of the business] to place the business in the enviable position it enjoyed," and testified the resulting estimate of lost goodwill ($410,271) was an amount for which the business could have been sold "within a matter of days." (*Ibid.*) Here Sanli did not utilize a cost to create approach and, more significantly, his calculations, unlike those of the

C

*We Reverse the Trial Court's Award of Litigation Expenses
Without Regard to the Agency's Contentions on Appeal*

 The Agency argues the trial court abused its discretion in awarding $1,230,714.14 in attorney fees to Mesdaq under section 1250.410, subdivision (b), which authorizes a trial court to award "litigation expenses" to the defendant in an eminent domain proceeding if it determines that the final pretrial "offer of the plaintiff was unreasonable and that the demand of the defendant was reasonable viewed in the light of the evidence admitted and the compensation awarded in the proceeding." (§ 1250.410, subd. (b); see also § 1250.410, subd. (a).) As the factors that the trial court was required to rely on, and did rely on, under section 1250.410 in making its determination were derived from a jury award that we now reverse, we accordingly reverse the trial court's award of litigation expenses, regardless of the merits of the Agency's contention on appeal. We do so without prejudice to any subsequent ruling by the trial court on litigation expenses after further proceedings on remand.

D

*The Trial Court Erred in Ruling That Mesdaq Was Entitled
to Precondemnation Damages Based on the Agency's
Issuance of the Polanco Act Notice*

The Agency also contends that the trial court erred in ruling that it could be liable for precondemnation damages for its issuance of the Polanco Act notice (the Notice). The Agency contends that precondemnation liability cannot attach to its lawful exercise of its "police power" (the issuance of the Notice), and in any event, there was no showing that as a result of the Agency's action, Mesdaq's property suffered a requisite "diminution in market value." (*Klopping, supra,* 8 Cal.3d at pp. 52, 53.)

1. *Applicable Legal Principles*

 (a) *Precondemnation Damages Under* Klopping

 The California Constitution's mandate that "[p]rivate property may be taken or damaged for public use only" by payment of "just compensation"

---

expert in *Inglewood,* were not derived from the operations of, or investment in, the *actual* business being valued. Rather, Sanli testified to a goodwill valuation that relied primarily on estimates of sales at a *hypothetical* alternative restaurant operated at the Gran Havana's location—a methodology that is not endorsed by the *Inglewood* opinion.

(Cal. Const., art. I, § 19) can be invoked via condemnation initiated by a public entity, or via inverse condemnation when a landowner initiates an action demanding to be paid for a de facto taking. (*Klopping, supra*, 8 Cal.3d at p. 43.)

In *Klopping*, the Supreme Court held that the "just compensation" requirement is also triggered where, prior to a taking, "the condemner acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct." (*Klopping, supra*, 8 Cal.3d at pp. 51–52.) In such circumstances, *Klopping* held, the Constitution also requires that "the owner be compensated," and announced the following rule: in an eminent domain action, "a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (*Klopping*, at p. 52.)

(b) *The Polanco Act*

 "The Polanco Act involves cleanup of the release of hazardous substances in the context of a redevelopment project" and "was enacted to provide a redevelopment agency with the means to require responsible parties to bear the costs of mitigating contamination on property within that agency's redevelopment project area." (*Redevelopment Agency v. Salvation Army* (2002) 103 Cal.App.4th 755, 765 [127 Cal.Rptr.2d 30].) The Polanco Act enables redevelopment agencies to remove hazardous substances on a property within a redevelopment project area and/or recover costs for the remedial action from a "responsible party" if the redevelopment agency satisfies various conditions, including that "the redevelopment agency has provided the responsible party with a 60-day notice requesting a remedial action plan for the property." (103 Cal.App.4th at p. 765; see Health & Saf. Code, § 33459.1, subd. (b)(2).) The definition of a "responsible party" under the statute includes the owner of the property. (*Salvation Army*, at pp. 770–771.)

2. *Procedural History*

Mesdaq's answer to the Agency's complaint in eminent domain included a request for compensation for allegedly unreasonable precondemnation actions by the Agency, including the issuance of the Notice. Pursuant to these allegations, on August 8, 2005, the court held a bench trial on the issue of the Agency's precondemnation conduct. (See *City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 897–898 [122 Cal.Rptr.2d 802] [where precondemnation damages are sought in a pending eminent domain action, "the appropriate

procedure is to bifurcate the trial of the action so that the question of the liability of the public entity is first adjudicated by the court without a jury"; "If liability for unlawful precondemnation conduct is not established by the court, the court should exclude evidence of alleged resulting damages from the jury"].)

At the precondemnation damages trial, Mesdaq established that on March 8, 2004, the Agency sent him the Notice, namely a letter informing him that there were "suspected releases" of hazardous substances on his property and that he had 60 days within which to respond with a "remedial action plan" or face potential liability for the Agency's costs of investigating and taking remedial action. (See Health & Saf. Code, § 33459 et seq.) Mesdaq testified that he spent "roughly 70 grand" in response to the Notice.

The trial court ruled that although it was a "close call," the Agency acted unreasonably in sending the Notice to Mesdaq because it did so "in conjunction with the developer acquiring the property" and "as a negotiation tool." As a result of the court's ruling, Mesdaq presented evidence regarding the Agency's issuance of the Notice to the jury and was awarded $77,823.83 in precondemnation damages based on fees that Mesdaq incurred when, after receiving the Notice, he consulted with attorneys and an environmental study group.

3. *The Trial Court's Ruling Is Erroneous Under* Klopping

The trial court's ruling that the Agency could be liable under *Klopping* for unreasonably issuing the Notice as a negotiation tool cannot be sustained.

 As *Klopping* itself makes clear, the availability of precondemnation damages is not akin to a court-created private right of action enabling property owners to collect damages whenever a redevelopment agency acts "unreasonably." (Cf. *City of Fresno v. Shewmake* (1982) 129 Cal.App.3d 907, 913 [181 Cal.Rptr. 451] ["*Klopping* did not hold that a property owner is entitled to be compensated for every aspect of his diminished use and enjoyment during a period of unreasonable precondemnation delay; it held only that a property owner is entitled to be recompensed for any diminution in *fair market value* resulting from that delay"].) Rather, *Klopping* damages are a narrow remedy enacted to enforce the constitutional requirement that property owners receive "just compensation" for any taking.

 As the *Klopping* court explained, "it would be manifestly unfair *and violate the constitutional requirement of just compensation* to allow a condemning agency to depress land values in a general geographical area prior to making its decision to take a particular parcel located in that area." (*Klopping,*

*supra*, 8 Cal.3d at p. 45, fn. 1, italics added; see *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 939 [55 Cal.Rptr.2d 724, 920 P.2d 669] ["Both eminent domain proceedings and inverse condemnation actions implement the constitutional rule that private property may not be 'taken' (U.S. Const., 5th Amend.) or 'taken or damaged' (Cal. Const., art. I, § 19) for public use without just compensation"]; *HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 517, fn. 14 [125 Cal.Rptr. 365, 542 P.2d 237] ["in *Klopping* the city in question made public announcements that it intended to acquire the plaintiff's land, then unreasonably delayed commencement of eminent domain proceedings, with the predictable result that the property became commercially useless and suffered a decline in market value. We held only that the plaintiff should be able to include in his eminent domain damages the decline in value attributable to this unreasonable precondemnation action by the city"].) Consequently, when a public entity issues a "precondemnation statement" unreasonably, and thus decreases the value of property subsequently taken, an aggrieved property owner must be "able to include in his eminent domain damages the decline in value attributable to this unreasonable precondemnation action by the city." (*HFH,* at p. 517, fn. 14; see *Klopping,* at p. 52 [property owner must demonstrate that "the property in question suffered a diminution in market value"].)

The trial court's ruling in the instant case falls outside of the narrow scope of the precondemnation remedy available under *Klopping.*

 We have been unable to locate, and the parties fail to cite, any case that holds that issuance of the Notice or any analogous regulatory activity can constitute a compensable "precondemnation statement" under *Klopping.* Rather, it appears that the trial court's ruling here constitutes a pronounced extension of *Klopping.* We think it significant that such an extension is not supported by any case decided in the *35 years* of case law that has developed since *Klopping.*[17] Indeed, "precondemnation statements" triggering *Klopping* damages generally constitute "an invasion or an appropriation of some valuable property right which the landowner possesses" or at least an "obstacle[] in the path of plaintiff in the use of its land." (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 119, 120 [109 Cal.Rptr. 799, 514 P.2d 111].) These invasions can thus themselves be analogized to a constitutional taking or damaging of property for which "just compensation" must be awarded. (See *Helix Land Co. v. City of San Diego* (1978) 82 Cal.App.3d 932, 945 [147 Cal.Rptr. 683] [no *Klopping* damages available because "[b]efore a compensable taking results, there must be (1) a physical invasion, or (2) a direct legal restraint"].) The issuance of the Notice in the

---

[17] In 12 pages of briefing on this issue, Mesdaq fails to cite any case that awards *Klopping* damages for similar regulatory conduct.

instant case is difficult to characterize as an invasion of Mesdaq's property rights or a taking or damaging of his property.

■ We need not decide, however, whether there are any circumstances in which issuance of the Notice could constitute a compensable precondemnation statement because, in the instant case, issuance of the Notice did not result in legally cognizable damages. Under *Klopping*, "damages . . . must be measured in terms of increasing or decreasing market values to the property involved." (*City of Los Angeles v. Property Owners* (1982) 138 Cal.App.3d 114, 120 [187 Cal.Rptr. 667].) Here, there is no evidence that the Agency's (unsuccessful) use of the Notice as a negotiation tool diminished the fair market value of Mesdaq's property. Mesdaq did not assert or provide evidence that issuance of the Notice depressed the fair market value of his property, but argued only that he was "damaged" by the Notice as a result of his having to consult with his attorneys and an environmental consultant, thus incurring fees. Such damages, while perhaps appropriate for a standard tort claim, cannot support precondemnation liability under *Klopping*. (*City and County of San Francisco v. Golden Gate Heights Investments* (1993) 14 Cal.App.4th 1203, 1213 [18 Cal.Rptr.2d 467] [precondemnation damages could not be awarded where "there is no evidence the property decreased in value as a result of City's conduct," and in fact, the property was "purchased . . . for $200,000" and later "appraised for between $500,000 and $1,680,000"]; *City of Los Angeles*, at p. 121 [reversing award of precondemnation damages where "respondents did not demonstrate that the conduct of appellant defeated the highest and best use of their properties nor was there any proof that the acts of appellant substantially impaired their property rights thus affecting the properties' market value"].)

In sum, the trial court's ruling failed to recognize that any award of *Klopping* damages must be tethered, as in *Klopping*, to a decrease in market value of the affected property, and instead created what amounted to a private right of action for the unreasonable issuance of the Notice, with resulting tort damages. Any such private right of action must be created by the Legislature, not the courts, and thus the trial court's ruling was erroneous as a matter of law and must be reversed. (*Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 292, 304–305 [250 Cal.Rptr. 116, 758 P.2d 58].)[18]

---

[18] Mesdaq references certain comments of the Agency's counsel in the trial court proceedings that he contends represent an implicit contention that *Klopping* damages were appropriate if the court found the Agency's conduct unreasonable. Mesdaq includes these references in a footnote in his respondent's brief regarding the appropriate standard of review, and again in supplemental briefing addressing the question of whether, assuming reversal of the *Klopping* ruling, the goodwill award would survive. We thus do not consider these contentions to properly raise the issue of whether the Agency objected on this ground below, and even if we did consider that argument properly raised, we would reject it. A fair reading of the trial

## II

## MESDAQ'S APPEAL

On appeal, Mesdaq challenges the trial court's ruling that the Agency had the legal authority to take his property. Specifically, Mesdaq argues the court erred by (i) failing to apply the appropriate standard of review in evaluating whether the Agency's action in taking his property constituted a "gross abuse" of the Agency's discretion; (ii) concluding that the Agency's action did not constitute a gross abuse of discretion; and (iii) limiting the evidence that he was permitted to introduce in challenging the Agency's actions. We need not reach the merits of Mesdaq's various challenges to the underlying taking, however, because, by statute, he has waived them..

### A

### *Procedural History*

As discussed in detail above, on April 30, 2004, the Agency filed a deposit of $3,091,000 with the court as probable compensation for the taking of Mesdaq's property and requested an order of possession, which was subsequently granted.

During the litigation, Mesdaq entered into a stipulation that, in the event the Agency was successful in taking his property, Mesdaq's mortgage lender, First National Bank (FNB), would receive payment of the balance of its loan out of the proceeds of the compensation award.

On August 4, 2005, seven months after the trial court rejected Mesdaq's challenges to the Agency's right to take his property, FNB filed an application for withdrawal of $1,194,555.60 of the Agency's probable compensation deposit, a sum which "represent[ed] the outstanding principal balance, interest balance, attorney's fees and costs due and owing by [Mesdaq] to FNB." The application noted the stipulation between Mesdaq and FNB, and that Mesdaq had defaulted on a recent loan payment. Mesdaq filed a response to FNB's request, stating that there was "no legal basis" for the request and that it violated the deed of trust on the property and the stipulation, which "both provide that [FNB] is not entitled to withdraw funds unless the case is settled or goes to judgment." (Cf. § 1255.230, subd. (d) [allowing "any party" to object to the withdrawal].) Nevertheless, Mesdaq asserted in his pleading that

---

proceedings *as a whole* demonstrates that the Agency did, in fact, vigorously contest its liability for issuing the Notice on the ground that such damages were unavailable as a matter of law under *Klopping.*

he was "not objecting to the withdrawal of the outstanding mortgage amount plus interest" to pay off his loan.[19] Mesdaq did object to $19,590.76 of FNB's request—the portion designated to pay FNB's attorney fees. In light of Mesdaq's consent to the bulk of FNB's request, the trial court subsequently authorized FNB to remove $1,174,964.90 from the Agency's deposit—the amount of FNB's request minus the amount objected to by Mesdaq. FNB subsequently withdrew the authorized sum.

B

*By Consenting to the Withdrawal of the Funds Deposited for His Property to Pay Off His Indebtedness, Mesdaq Forfeited Any Further Right to Object to the Taking*

By statute, "[i]f any portion of the money deposited pursuant to" an eminent domain action "is withdrawn, the receipt of any such money shall constitute a waiver by operation of law of all claims and defenses in favor of the persons receiving such payment except a claim for greater compensation." (§ 1255.260.) Under section 1255.260, which dates back to 1897 (*Mt. San Jacinto, supra,* 40 Cal.4th at p. 659, fn. 6), "a condemnee's withdrawal of deposited funds waives any challenge to the right to take" and "any claim as to lack of a public purpose." (*Clayton v. Superior Court* (1998) 67 Cal.App.4th 28, 33 [78 Cal.Rptr.2d 750] (*Clayton*); see *Mt. San Jacinto, supra,* 40 Cal.4th at p. 663 [§ 1255.260 "waiver includes the right to contest the condemner's right to take the property"]; cf. *People ex rel. Dept. of Public Works v. Gutierrez* (1962) 207 Cal.App.2d 759, 764 [24 Cal.Rptr. 781] ["when the condemner deposited the money into court and the condemnee elected to receive it under the conditions and restrictions of [former] section 1254 condemner thereupon obtained the right to the possession of the premises condemned"].)

In *Mt. San Jacinto,* our Supreme Court explained the policy rationale behind section 1255.260. "[T]he Legislature reasonably could have found that it would be inconsistent for an owner to deny the condemner's right to take with one hand while it withdraws and uses the condemner's deposit with the other. An owner cannot have it both ways. It is reasonable to require the owner to choose one or the other: either to deny the condemner's right to take the property and litigate, or to take the deposit." (*Mt. San Jacinto, supra,* 40 Cal.4th at p. 666.)

---

[19] Mesdaq appended the deed of trust to his filing, which states that if "any award is made or settlement entered into in any condemnation proceedings affecting" the property, FNB is entitled to apply the "award or settlement" to its indebtedness.

Construing the statute, it is beyond dispute that a "portion" of the Agency's deposit for Mesdaq's property was "withdrawn," and thus any further challenge to the taking of the property is precluded as to "the persons receiving such payment." (§ 1255.260.) Recognizing this, Mesdaq argues only that since FNB (i.e., not Mesdaq) actually received the deposit, any statutory waiver "runs only to FNB." We disagree.

We do not believe there is any legal distinction under section 1255.260 between FNB and Mesdaq with respect to the withdrawal of funds in this case. The money withdrawn was used to satisfy *Mesdaq's indebtedness* to FNB, resulting in a direct increase in the value of Mesdaq's ownership interest in the condemned property, and relieving him of his mortgage obligations and accrual of interest on those obligations. Such a transaction easily constitutes Mesdaq's "receipt of" the money withdrawn from the deposit. (§ 1255.260.)

Further, the payment of Mesdaq's indebtedness with the deposit funds was accomplished with Mesdaq's explicit consent. Mesdaq noted in his pleadings with the court that FNB did not have the legal authority to withdraw the Agency's deposit, but nonetheless informed the court that he (the rightful owner of the deposit) did not object to FNB's withdrawal of the funds for the purpose of satisfying *Mesdaq's* loan obligation. (See § 1255.230, subd. (d) [specifically authorizing parties to object to withdrawal requests].) Accordingly, the trial court, emphasizing Mesdaq's lack of objection, authorized FNB's withdrawal. (See § 1255.220 [requiring court to permit withdrawal if applicant is "entitled to receive" funds from deposit].) We see no distinction between this scenario—where Mesdaq consented to the withdrawal of the deposit by his bank to pay off his loan on the property—and a scenario where Mesdaq himself withdrew the deposit and forwarded it to FNB for that purpose. In both situations, Mesdaq has received the funds from the Agency's deposit, and section 1255.260 consequently mandates a waiver of any future objections to the taking.[20]

In light of the statutory waiver, Mesdaq has waived "all claims and defenses" with respect to the eminent domain action "except a claim for greater compensation." (§ 1255.260.) As it is undisputed that a challenge to an agency's right to take property is not "a claim for greater compensation," it necessarily follows that Mesdaq has waived the claims raised in his appeal. (*Ibid.*; *Mt. San Jacinto, supra,* 40 Cal.4th at p. 665; *Clayton, supra,* 67 Cal.App.4th at p. 33.)

---

[20] We express no opinion on the question of whether Mesdaq would have waived his right to challenge the taking on appeal if the trial court had permitted FNB to withdraw the deposit over Mesdaq's objection.

III

DISPOSITION

The judgment is reversed, and the case is remanded to the superior court for further proceedings consistent with this opinion. The parties are to bear their own costs on appeal.

Nares, Acting P. J., and McDonald, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 28, 2007, S157032.